# IN THE SUPREME COURT OF TEXAS

══════════

No. 14-0067

══════════

MIRTA ZORRILLA, PETITIONER,

v.

AYPCO CONSTRUCTION II, LLC AND JOSE LUIS MUNOZ, RESPONDENTS

══════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS
══════════════════════════════════════════

**Argued March 26, 2015**

JUSTICE GUZMAN delivered the opinion of the Court.

In this residential construction dispute, the paramount issue on appeal is whether the statutory cap on exemplary damages is waived if not pleaded as an affirmative defense or avoidance. *See* TEX. R. CIV. P. 94 (requiring pleading and proof of affirmative defenses and avoidances); *see also* TEX. CIV. PRAC. & REM. CODE § 41.008(b) (limiting exemplary damages to the greater of $200,000 or two times economic damages plus noneconomic damages not exceeding $750,000). Our courts of appeals are split on the issue, and in this case, the lower court affirmed an exemplary damages award in excess of the statutory cap because the petitioner did not assert the cap until her motion for new trial. 421 S.W.3d 54, 68-69 (Tex. App.—Corpus Christi 2013). We hold the exemplary damages cap is not a "matter constituting an avoidance or affirmative defense" and need not be affirmatively

pleaded because it applies automatically when invoked and does not require proof of additional facts. *See* TEX. R. CIV. P. 94. Here, the petitioner did not plead the statutory cap but she timely asserted the cap in her motion for new trial. We therefore reverse the court of appeals' judgment in part and render judgment capping exemplary damages at $200,000. We affirm the court of appeals' judgment in all other respects.

## I. Background

The principal issue in this case involves a relatively straightforward matter of statutory construction, but the petitioner, Mirta Zorrilla, raises myriad other issues that are better understood with a more thorough recitation of the events giving rise to the dispute and the evolution of the complaints presented on appeal.

Aypco Construction II, L.L.C. and its owner, Jose Luis Munoz, sued Zorrilla after she refused to pay several invoices charging for construction work at two residential properties in May 2007. At trial, Zorrilla did not dispute having engaged Munoz to provide residential construction services, but she disclaimed an agreement to pay for the work billed in the May 2007 invoices.

As all parties agree, the construction project initially involved a single unfinished 3,740 square foot residence at North 23rd Street in Edinburg, Texas, which Zorrilla began constructing in 2006 with the assistance of contractors who are not parties to this litigation. By November 2006, she had become dissatisfied with the timeliness and quality of the construction work and sought other service providers. Following a business associate's recommendation, Zorrilla first contacted Munoz for the limited purpose of constructing modifications to the master bedroom and bathroom in the partially finished home.

2

Apparently satisfied with that work, the parties entered negotiations for construction services necessary to complete the North 23rd Street home. There is no dispute that Zorrilla agreed to pay for certain construction services, but nearly every facet of the ensuing agreement is in dispute. Among the disputed matters are the parties to the agreement, whether the agreement was written or oral, the amount Zorrilla agreed to pay, and whether modifications, additional construction projects, and work at a separate residence were included and, if so, on what terms.

At the outset, Munoz provided Zorrilla with a written estimate of $212,973 to complete the North 23rd Street residence. Although that fact is not in dispute, the parties provided the jury with markedly different versions of the events that transpired from that point forward.

According to Zorrilla, she orally agreed to the $212,973 estimate Munoz had presented to her and demanded that he complete construction within three months. Although she claimed she had never hired Aypco Construction and had only agreed to work with Munoz, she admitted that Munoz's business card, estimates, blueprints, and invoices prominently bore Aypco Construction's name and that she had made all her checks payable to Aypco. Further, despite having paid related invoices, Zorrilla categorically denied she ever requested or approved (1) any modifications to the original estimate for the North 23rd Street residence, (2) any additional construction projects on the same property, and (3) any construction work at another residence that was located on Plazas del Lago Drive in Edinburg, Texas. The only modification to the agreement Zorrilla acknowledged was an oral agreement for a one-month extension to complete construction of the house on the North 23rd Street property, which she approved because there had been weather and materials delays; however, she said she expressly informed Munoz that he could not continue working on the property

3

beyond April 2007.

Munoz nevertheless invoiced Zorrilla for construction services through the month of May 2007. There is no dispute that Zorrilla paid Munoz for all invoiced construction services through the end of April 2007, paying him nearly $367,000 for that work. However, she refused to pay any invoices for work performed in May 2007, claiming the work was unauthorized or had been previously invoiced.

Munoz presented a vastly different scenario, asserting the $212,973 estimate was part of a detailed written contract, which he and Zorrilla both signed on December 9, the day Zorrilla hired Aypco Construction. Among the terms of the written agreement was a requirement that "any addition, deviations or omissions from the original plans" be approved by the parties in writing before work commenced. The agreement further specified that construction would be completed in six months, but to appease Zorrilla's desire for an earlier completion date, Munoz hand wrote and initialed the following change to the agreement: "NOTE: Estimated time of completion is 4 months, pending weather conditions, inspections timing, and arrival of special order items." However, Munoz had taken two copies of the agreement to Zorrilla with the intention that she would keep one for her records, and he only made the handwritten change to one of the copies. Zorrilla returned both copies of the agreement to him, but she signed only the copy that included the six-month estimate for completion. In her pleadings and at trial, Zorrilla disavowed the existence of any written agreement, claiming that her signature on the December 2006 agreement had been forged.

Although disputing the form and substance of the construction agreement, the parties agree that Aypco Construction began work at the North 23rd Street property in late December 2006 and

4

that Zorrilla regularly visited the job site throughout the construction process, frequently speaking with Munoz or his subcontractors two or three times a day.

Soon after construction began, significant modifications and additions were made to the North 23rd Street property that were beyond the scope of the original estimate.[1] Munoz testified that Zorrilla specifically requested all additional work and modifications, and importantly, his testimony about Zorrilla's requests was corroborated in several respects by other witnesses.

Munoz also produced a revised estimate he had provided to Zorrilla in early March that totaled $540,303, including nearly $150,000 attributable to a 2,300 square foot guest house Aypco had substantially constructed on Zorrilla's property. Munoz does not claim that Zorrilla signed the estimate or executed a revised written contract.

Zorrilla admitted she saw the revised estimate, was aware that the improvements were being constructed on her property, and "extensively" discussed the matter with Munoz, but she flatly denied approving upgrades to the main house and any additional work, including the guest house. Zorrilla further claimed she had repeatedly requested Munoz to cease construction activities outside the scope of the original estimate, but she nevertheless paid in full several written invoices explicitly

---

[1] Among the alterations not included in the original estimate were:

- construction of a 2,300 square foot guest house;
- installation of custom-made windows;
- conversion of the attic into a maid's quarters;
- conversion of the garage into a game room;
- construction of a lake and leveling of the front yard with the excavated dirt;
- addition of water fountains and a jacuzzi to an outdoor pool;
- addition of a perimeter fence and front entrance to the property;
- construction of a retaining wall;
- a paved driveway; and
- taller kitchen cabinets.

identifying that work as constituting "modifications" or "extras."[2]

In addition to providing construction services to Zorrilla at the North 23rd Street residence, Munoz and an Aypco Construction employee, Gregorio Perez, testified that Zorrilla requested they make repairs to another residential property she owned on Plazas del Lago Drive. According to Munoz and Perez, construction work at Plazas del Lago included remediating damage caused by a water leak and repairing a sprinkler system. Itemized invoices and cancelled checks reflect that Zorrilla paid Aypco Construction for some of the Plazas del Lago work, but she denied ever hiring Aypco Construction to perform any repair work on that property.

While construction was ongoing, Aypco Construction billed Zorrilla on a weekly basis by providing her one-page documents entitled "Weekly Advances." Each weekly invoice categorized, to varying degrees, the labor and material costs for work that had been performed and informed Zorrilla of the amount immediately owed to Aypco. Zorrilla acknowledged receiving the weekly invoices and agreed that she had paid Aypco based on the amounts identified in those invoices through the end of April 2007. However, she denied having consented to invoiced work that exceeded the original estimate, asserting that (1) the invoices were difficult to decipher because they listed multiple projects and sometimes billed separately for materials and labor; (2) she did not scrutinize the bills because she trusted Munoz; (3) she was too busy with her psychiatry practice to pay attention to billing for the construction project; and (4) Munoz often pressured her to pay the

_____

[2] At trial she explained:

> [Munoz] was building this guest house against my wishes. And I wanted to finish my house, so [Munoz] promised to finish it if I would pay, and I continued to pay under the advice of my accountant and under [Munoz's] advice.

6

invoices when she had inadequate time to thoroughly review them.

As the work progressed, the timeliness of Zorrilla's payments became sporadic and unreliable. She paid the first two weekly invoices on time, but beginning in the third week, payments were frequently one to two weeks late. When Zorrilla delayed making payments, Munoz testified he had to use his personal funds and credit to meet his weekly obligations to subcontractors. Despite problems with timely payments, Munoz testified that Aypco continued to work on the job site to avoid the delays and difficulties associated with retaining subcontractors and to maintain compliance with the agreement with Zorrilla.

In May 2007, Zorrilla stopped paying altogether, leaving five consecutive invoices for material and labor expenses unpaid. Munoz testified he was unaware of an issue with the billing and continued to work on the project because Zorrilla had an established practice of paying late. However, on the third weekly invoice in May he wrote, "Respectfully, I remind you that we will [not be able to] continue with the work on the main house next week, because we don't have materials." On the fourth invoice that month, he wrote, "Respectfully I need the payment on this last four weeks to continue with the project." And on the fifth and final invoice, he wrote, "Next Monday, June 4th we will stop the project completely, because I didn't get paid the last 5 weeks."

Zorrilla never paid any of the May invoices. Zorrilla's excuses for nonpayment included that she had instructed Munoz to cease work by the end of April because she was dissatisfied that construction of the main house was incomplete; she had never authorized work beyond the scope of the original estimate; and no work had actually been performed on the property in May.

Munoz denied that anyone told him to cease working on the North 23rd Street project until

7

the first Monday in June and, to the contrary, Zorrilla continued to request modifications to the property in May. According to Munoz, construction did continue throughout May, albeit in decreasing amounts due to lack of funds, and by the end of May, 80% of the work on the main house and 70% of the work on the guest house had been completed.

When Zorrilla did not pay the May invoices, Aypco Construction and Munoz sued Zorrilla for breach of contract and fraud, among other claims. Aypco and Munoz also sought attorney's fees, exemplary damages, and foreclosure of mechanic's and materialman's liens attached to the North 23rd Street and Plazas del Lago properties. The case was tried before a jury on fraud, breach-of-contract, and quantum meruit theories.[3]

Although Zorrilla vehemently denied that any written contract existed and insisted that her signature had been forged on the December 2006 agreement, no jury question was submitted inquiring about the existence or terms of a written contract. With respect to the existence and breach of a contract, the jury charge only inquired whether "AYPCO CONSTRUCTION II, LLC and MIRTA ZORRILLA agree[d] that in return for payment [AYPCO] would perform construction services in May of 2007" at the North 23rd Street and Plazas del Lago properties and, if so, whether Zorrilla failed to comply with that agreement. The trial court refused to submit a question inquiring whether Zorrilla's noncompliance was excused due to a prior material breach by Aypco.[4] Zorrilla's

---

[3] Aypco and Munoz asserted additional claims for violations of the Texas Construction Fund Act, the Prompt Payment to Contractors and Subcontractors Act, negligent misrepresentation, and defamation. The trial court dismissed the Construction Fund Act claim following a motion for directed verdict, and Aypco and Munoz abandoned the negligent misrepresentation and defamation claims at trial.

[4] Although Zorrilla had not pleaded prior material breach as an affirmative defense, she had asserted a counterclaim for breach of contract on the basis that Munoz failed to (1) "finish the project," (2) "bring 'bids' for her approval," and (3) "provide[] Zorrilla with a written contract."

objection to the omission was overruled, and there were no other objections to the jury charge by either party.

The jury found that Zorrilla defrauded Aypco Construction and awarded $56,654.15 in economic damages and $250,000 in exemplary damages.[5] The jury also found Zorrilla breached an agreement to pay Aypco for construction services at her two homes and awarded a total of $56,654.15 in actual damages. In addition to compensatory and exemplary damages, the jury awarded Aypco Construction $150,000 in attorney's fees through trial and conditional attorney's fees in the event of an appeal.

Aypco Construction moved for judgment on the jury's verdict, electing to recover under its fraud theory. The trial court awarded fraud and exemplary damages as found by the jury, plus attorney's fees and prejudgment interest at the rate of 1.5% per month pursuant to the Prompt Payment to Contractors and Subcontractors Act (the Prompt Payment Act). In addition to money damages, the court ordered foreclosure of Aypco Construction's liens on the North 23rd Street and Plazas del Lago properties.

In a motion for new trial, Zorrilla attacked the judgment on multiple grounds, including that (1) the award of attorney's fees was inconsistent with Aypco's election of remedies; (2) the evidence was insufficient to support the misrepresentation and reliance elements of the jury's fraud finding; (3) the exemplary damages award failed for the same reason; (4) the jury's breach-of-contract finding could not be sustained in light of evidence that Zorrilla paid more than the original estimate and had

---

[5] With the exception of the quantum meruit damages questions, which the jury did not reach, the jury questions did not mention Munoz, individually.

9

specifically informed Aypco and Munoz that she would not pay for any work after April; (5) exemplary damages should be capped in accordance with section 41.008(b) of the Texas Civil Practice and Remedies Code; (6) the statutory lien on the North 23rd Street property was invalid because that property was her homestead and work had commenced on the property before a written contract was executed in accordance with the lien statute; and (7) the correct prejudgment-interest rate was 6% because the parties did not agree to any other interest rate. Zorrilla's motion was overruled by operation of law. *See* TEX. R. CIV. P. 329b(c).

On appeal, Zorrilla augmented and refined her arguments, asserting that (1) the evidence was legally and factually insufficient to support all elements of the breach-of-contract claim; (2) the trial court erred in refusing to submit the prior-material-breach question to the jury because it was raised by evidence that Aypco failed to timely complete construction and failed to obtain prior written approval for any modifications; (3) the prejudgment-interest rate was erroneous due to insufficient evidence of a contract, as required to obtain the higher interest rate authorized by the Prompt Payment Act; (4) foreclosure of the property liens was improper due to insufficient evidence of an agreement covering the disputed services; (5) the constitutional lien on the Plazas del Lago residence was invalid because that property was Zorrilla's homestead and Aypco failed to provide proof that it had complied with constitutional requirements for liens against a homestead; (6) the evidence of intent was insufficient to support the jury's fraud finding; (7) the attorney's fee award violated the "one satisfaction rule" in light of Aypco's fraud election; and (8) the exemplary damages award exceeded the statutory cap and violated the Texas and United States Constitutions.

The court of appeals affirmed the trial court's judgment except the award of attorney's fees.

421 S.W.3d at 58. Concluding that sufficient evidence supported the jury's fraud verdict and giving effect to Aypco Construction's election of its fraud remedies, the court reversed the attorney's fee award without considering Zorrilla's charge-error and evidence-sufficiency challenges to the jury's breach-of-contract findings. *Id.* at 66-67. The court also affirmed the prejudgment interest awarded under the Prompt Payment Act, foreclosure of the liens on both of Zorrilla's properties, and the exemplary damages award. *Id.* at 72-74.

The court determined that the 1.5% monthly prejudgment-interest rate could be sustained under the Prompt Payment Act, based on the jury's answer to the fraud question, which required the jury to find an unfulfilled agreement to pay Aypco for construction services. *Id.* at 72-73. On the same basis, the court upheld foreclosure of the mechanic's and materialman's liens and further concluded that Zorrilla failed to plead and prove that the Plazas del Lago property was her homestead. *Id.* at 73-74. In affirming the exemplary damages award, the court concluded that (1) the statutory cap on exemplary damages did not apply because Zorrilla failed to expressly plead the cap as an affirmative defense and (2) the uncapped exemplary damages award did not exceed due-process limits. *Id.* at 69, 72.

On appeal to this Court, Zorrilla devotes most of her efforts to the exemplary damages issue, arguing that (1) she was not required to plead the statutory cap on exemplary damages and (2) if uncapped, the exemplary damages award is excessive and violates due process. She also complains about the court of appeals' refusal to consider her evidence-sufficiency challenges to the jury's breach-of-contract findings, asserting that the validity of the fraud verdict, the prejudgment-interest rate, and property liens all turn on the existence of an enforceable agreement. Relatedly, she

11

contends the court of appeals should have addressed her jury-charge issue regarding prior material breach. Aypco Construction has not challenged the lower court's adverse ruling on its claim for attorney's fees.

## II. Discussion

The marquee issue for the parties and various amicus curiae is whether the exemplary damages cap in section 41.008(b) of the Texas Civil Practice and Remedies Code is either an affirmative defense or an avoidance that must be expressly pleaded. *See* TEX. R. CIV. P. 94. We granted review to resolve a conflict among the courts of appeal on this issue.[6] Before addressing that issue, however, we must consider Zorrilla's complaint that the court of appeals failed to consider her evidence-sufficiency challenges to the jury's breach-of-contract findings in conjunction with reviewing the predicate fraud finding. *See* TEX. CIV. PRAC. & REM. CODE § 41.003 (authorizing exemplary damages only with clear and convincing evidence that harm resulted from fraud, malice, or gross negligence).

### A. Existence of a Contract as it Relates to Fraud

In light of Aypco's fraud election and the sufficiency of the evidence to support the jury's

---

[6] *Compare Horizon/CMS Healthcare Corp. v. Auld*, 985 S.W.2d 216, 230 (Tex. App.—Fort Worth 1999), *rev'd in part on other grounds*, 34 S.W.3d 887 (Tex. 2000) (statutory exemplary damages cap is an affirmative defense that must be pleaded); *Shoreline, Inc. v. Hisel*, 115 S.W.3d 21, 25 (Tex. App.—Corpus Christi 2003, pet. denied) (same); *Wackenhut Corr. Corp. v. De La Rosa*, 305 S.W.3d 594, 651 (Tex. App.—Corpus Christi 2009, no pet.) (same); *Marin v. IESI TX Corp.*, 317 S.W.3d 314, 333 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (same); *O'Dell v. Wright*, 320 S.W.3d 505, 515-16 (Tex. App.—Fort Worth 2010, pet. denied) (same); *SJW Prop. Commerce Inc. v. Sw. Pinnacle Props.*, 328 S.W.3d 121, 165-66 (Tex. App.—Corpus Christi 2010, pet. denied) (same); *Davis v. White*, No. 02-13-00191-CV, 2015 WL 7387045, at *10 (Tex. App.—Fort Worth Feb. 5, 2015, pet. filed) (same), *with Seminole Pipeline Co. v. Broad Leaf Partners, Inc.*, 979 S.W.2d 730, 759 (Tex. App.—Houston [14th Dist.] 1998, no pet.) (statutory exemplary damages cap is not an affirmative defense); *Hall v. Diamond Shamrock Ref. Co., L.P.*, 82 S.W.3d 5, 22 (Tex. App.—San Antonio 2001), *overruled on other grounds*, 168 S.W.3d 164 (Tex. 2005) (same); *THI of Tex. at Lubbock I, LLC v. Perea*, 329 S.W.3d 548, 587 (Tex. App.—Amarillo 2010, pet. denied) (same).

fraud findings, the court of appeals did not consider Zorrilla's appellate issues related to the jury's breach-of-contract findings. Zorrilla asserts the fraud verdict cannot be affirmed if her breach-of-contract complaints are valid because the only fraud theory submitted to the jury was fraudulent inducement, which requires the existence of an enforceable contract. *See Haase v. Glazner*, 62 S.W.3d 795, 798, 800 (Tex. 2001) (fraudulent inducement, by its nature, presupposes that a party has been induced to enter a contract; as a result, there can be no fraudulent-inducement claim when there is no contract). Zorrilla takes the position that the breach-of-contract findings are thus integral to the jury's fraud verdict and that the court of appeals' refusal to consider her challenges to those findings in tandem with the fraud findings was error. Zorrilla does not otherwise assail the court's fraud analysis.

Departing from the position she maintained in the trial court, Zorrilla relies exclusively on the terms of the December 2006 written agreement as the basis for challenging the existence of an enforceable agreement for the disputed construction services in May 2007. The December 2006 agreement required all modifications and deviations to be pre-approved in writing. Embracing the written contract she once expressly disavowed, Zorrilla contends there is no viable fraudulent-inducement claim because there is no evidence the May 2007 charges were pre-authorized in writing as required by the December 2006 agreement.[7] Simply stated, Zorrilla argues there is no evidence of a valid contract for the disputed construction services because there is no evidence of a valid modification to the original estimate.

---

[7] The extent to which the May invoices reflect charges for work beyond the original estimate is unclear; the only readily apparent deviations are charges for work at the Plazas del Lago property and charges for security personnel.

13

We agree with Zorrilla that, based on the measure of damages submitted to the jury, the only viable fraud claim is fraudulent inducement, which cannot be sustained when it is grounded on an unenforceable promise. However, we do not agree that the court of appeals was required to consider her evidence-sufficiency challenges to the breach-of-contract findings to uphold the fraud judgment.

A common-law fraud claim requires "'a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury.'" *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998) (quoting *Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d 281, 282 (Tex. 1994)). Fraudulent inducement is a distinct category of common-law fraud that shares the same elements but involves a promise of future performance made with no intention of performing at the time it was made. *Id.* at 48.

"Texas recognizes two measures of direct damages for common-law fraud: the out-of-pocket measure and the benefit-of-the bargain measure." *Id.* at 49. The former "derive[s] from a restitutionary theory" while the latter "derive[s] from an expectancy theory." *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007). Out-of-pocket damages are measured by the difference between the value expended versus the value received, thus allowing the injured party to recover based on the actual injury suffered. *Formosa Plastics*, 960 S.W.2d at 49. Benefit-of-the-bargain damages are measured by the difference between the value as represented and the value received, allowing the injured party to recover profits that would have been made had the bargain been performed as promised. *Id.* at 49-50.

Although both measures of damages are available for fraudulent inducement, we held in

14

*Haase v. Glazner* that benefit-of-the-bargain damages are not available for fraud that induces a non-binding contract; rather, if there is a defect in contract formation, the only potentially viable measure of fraud damages is the out-of-pocket measure. 62 S.W.3d at 799-800. We explained:

> Fraudulent inducement . . . is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof. That is, with a fraudulent inducement claim, the elements of fraud must be established as they relate to an agreement between the parties. . . . Although economic losses may be recoverable under either fraud or fraudulent inducement . . . *fraud and fraudulent inducement are [not] interchangeable with respect to the measure of damages that would be recoverable.*

*Id.* at 798-99 (emphasis added). In *Haase*, the parties' oral agreement was unenforceable under the statute of frauds, and we held that the injured party could not recover the benefit of an unenforceable bargain via a fraud claim but could still recover out-of-pocket damages, if any. *Id.* at 799-800; *cf. Sonnichsen*, 221 S.W.3d at 636-37 (holding that the fraud claim failed on summary judgment because plaintiff only sought benefit-of-the-bargain damages under a contract rendered unenforceable by application of the statute of frauds). Thus, absent an enforceable contract, a fraud claimant may not recover benefit-of-the-bargain damages. *See Haase*, 62 S.W.3d at 799-800.

In the present case, the fraud liability question submitted to the jury included all the elements of a common-law fraud claim and defined "misrepresentation" to mean "a false statement of fact" or "a promise of future performance made with an intent, at the time the promise was made, not to perform as promised." TEXAS PATTERN JURY CHARGES (BUSINESS) 105.1-105.3B (2010); *see also* TEXAS PATTERN JURY CHARGES (BUSINESS) 105.1-105.3B (2012). The damages question submitted

15

only a benefit-of-the-bargain measure of damages, however, not an out-of-pocket measure.[8] Accordingly, if the promise underlying the jury's fraud finding is unenforceable, no sustainable measure of fraud damages was submitted to the jury. Stated another way, benefit-of-the-bargain damages are not available if Aypco would not have been able to enforce the bargain in question due to a defect in contract formation, and the fraud claim would fail for want of an appropriate damages finding.

The fraud questions submitted to the jury incorporate the requisite elements of a contract—promise, reliance, and an agreement—but Zorrilla contends that any such contract was unenforceable because there was no writing specifically authorizing the May 2007 construction services. Invoking the rule in *Haase*, Zorrilla relies on the written-modifications requirement in the December 2006 agreement as a proxy for the statute of frauds, which in *Haase* precluded recovery of benefit-of-the-bargain damages under a fraudulent-inducement theory.

---

[8] The jury answered the following fraud-damages question:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate AYPCO CONSTRUCTION II, LLC for its damages, if any, that resulted from such fraud?

Consider the following elements of damages, if any, and none other.

The difference between the amount paid by MIRTA ZORRILLA to AYPCO CONSTRUCTION II, LLC for the construction services performed by AYPCO CONSTRUCTION II, LLC and the amount MIRTA ZORRILLA had agreed to pay AYPCO CONSTRUCTION II, LLC for that work.

Do not speculate what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answer at the time of judgment. Do not add any amount for interest on damages, if any.

Answer in dollars and cents for damages, if any, sustained in the past.

Zorrilla's newfound reliance on the December 2006 contract, however, is too little, too late. Any obligation imposed by the December 2006 contract impacts the fraudulent-inducement analysis only if the jury necessarily determined that Zorrilla had, in fact, agreed to the terms of the December 2006 contract or that there was otherwise an agreement between the parties requiring written approval for modifications. However, the evidence on that point conflicted; the jury was neither asked whether the agreement was in writing nor asked to determine the essential terms of any agreement; and, importantly, both the fraud and breach-of-contract questions permitted the jury to award damages based on the existence of an oral agreement that did not include any such requirement. In the absence of a finding that Zorrilla and Aypco agreed that modifications must be approved in writing, Zorrilla's argument concerning the contract-enforcement issue fails. *See Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 221 (Tex. 2005) ("The sufficiency of the evidence must be measured by the jury charge when . . . there has been no objection to it."). Finding no error in the court of appeals' refusal to consider Zorrilla's evidence-sufficiency challenges to the jury's breach-of-contract findings, we reject the only ground presented in opposition to the jury's fraud verdict.[9]

---

[9] Zorrilla also argues that failure to submit her requested jury issue on excuse for nonperformance was error because she may have avoided liability for breach of contract. Performance of a contract is distinct from formation of a contract; whether Zorrilla has an excuse for nonperformance has no bearing on the existence of an enforceable agreement. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 46-48 (Tex. 1998) (recognizing that contract theories govern claims of contractual nonperformance while a promise made without intent to perform is independently actionable as fraud even if the promise is later subsumed in a contract because "the legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself"). She also contends that the court of appeals should have considered the breach, causation, and contract-damages findings, but those are likewise independent of the fraudulent-inducement inquiry, which pertains to contract formation.

17

## B. Exemplary Damages

We turn now to Zorrilla's primary argument contesting the exemplary damages award. Zorrilla argues the award of exemplary damages in the amount of $250,000 on $56,654.15 in economic damages (1) exceeds the statutory cap and should be reduced accordingly and (2) if uncapped the award violates both the United States and Texas Constitutions. Because we resolve the first issue in Zorrilla's favor, we do not reach the second issue.[10]

Section 41.008 of the Texas Civil Practice and Remedies Code provides that:

Exemplary damages awarded against a defendant may not exceed an amount equal to the greater of:

(1)(A) two times the amount of economic damages; plus

(B) an amount equal to any noneconomic damages found by the jury, not to exceed $750,000; or

(2) $200,000.

TEX. CIV. PRAC. & REM. CODE § 41.008(b). Zorrilla concedes she did not specifically plead the statutory cap on exemplary damages and did not raise the issue until her motion for new trial. Aypco contends that Zorrilla therefore waived the statutory cap. The court of appeals adopted Aypco's approach, but we agree with Zorrilla.

The Texas Rules of Civil Procedure require that specific defenses and any matter "constituting an avoidance or affirmative defense" "shall [be] set forth affirmatively" in a responsive pleading. TEX. R. CIV. P. 94. If an affirmative defense or avoidance is not expressly pleaded, the party cannot

---

[10] We further observe that Zorrilla did not challenge the exemplary damages award on constitutional grounds in the trial court. *See* TEX. R. APP. P. 33.1(a) (complaint presented on appeal must be preserved in the trial court by specific and timely request, objection, or motion).

18

rely on the defense as a bar to liability. *MAN Engines & Components, Inc. v. Shows*, 434 S.W.3d 132, 136 (Tex. 2014). Rule 94 does not explicitly require that a damages cap be affirmatively pleaded. *See* TEX. R. CIV. P. 94. We must therefore determine whether the exemplary damages cap in section 41.008(b) falls within Rule 94's residual clause, which extends the affirmative-pleading requirement to "any other matter constituting an avoidance or affirmative defense." *See id*.

The scope of a procedural rule is a question of law, which we review de novo by applying the same canons of construction applicable to statutes. *Morris v. Aguilar*, 369 S.W.3d 168, 171 n.4 (Tex. 2012). Accordingly, we start by giving Rule 94's language its plain and literal meaning. *In re Christus Spohn Hosp. Kleberg*, 222 S.W.3d 434, 437 (Tex. 2007).

Aypco and its amici argue that "affirmative defense" and "avoidance" are necessarily distinct terms of art because the inclusion of two separate terms would be redundant and serve no purpose. They suggest, without offering support, that the term "avoidance" broadly includes new matters of law and fact that are outside of the plaintiff's pleadings. We disagree.

"Avoidance" is best defined in reference to "affirmative defense." Also called a plea in avoidance, an "affirmative defense" is "[a] defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all the allegations in the complaint are true." BLACK'S LAW DICTIONARY 509 (10th ed. 2009). In contrast, the term "avoidance" derives from the historic English common-law pleas of "confession and avoidance." *See* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1270 (3d ed. 2004); *see also* BLACK'S LAW DICTIONARY at 163 (defining "avoidance" by reference to "confession and avoidance"). In its ordinary meaning, a "confession and avoidance" is "a plea in which a defendant admits allegations

19

but pleads additional facts that deprive the admitted facts of an adverse legal effect." BLACK'S LAW DICTIONARY at 361. Essentially:

> [A confession-and-avoidance plea] is one of justification. It is based on a different set of facts from those establishing [the cause of action]. As an affirmative defense it [acknowledges] the existence of prima facie liability but [asserts] a proposition which, if established, avoids such liability. Rather than being in conflict with the [cause of action], the [confession and avoidance] admits it but asserts the existence of other facts which justify or excuse it.

*Norris v. Branham*, 557 S.W.2d 816, 818 (Tex. App.—El Paso 1977, writ ref'd n.r.e.) (describing self-defense, a defense long recognized as a plea in confession and avoidance); *see also Genesis Tax Loan Servs. Inc. v. Kothmann*, 339 S.W.3d 104, 108 (Tex. 2011) (defining avoidance as "an independent reason why the plaintiff should not recover"). For example, a statute of limitations is an affirmative defense, rather than a plea in confession and avoidance, because limitations defeats the plaintiff's claim without regard to the truth of the plaintiff's assertions. *See Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 517-18 (Tex. 1988). In contrast, self-defense is a confession-and-avoidance plea because the defendant admits the conduct but seeks to avoid the legal effect by justifying an otherwise impermissible act. *Grieger v. Vega*, 271 S.W.2d 85, 90 (Tex. 1954); *see also Gibbins v. Berlin*, 162 S.W.3d 335, 340 (Tex. App.—Forth Worth 2005, no pet.) (distinguishing between self-defense in the civil context and self-defense in the criminal context). Similarly, contributory negligence is a plea in confession and avoidance because the defense allows a negligent defendant to defeat the plaintiff's recovery either partially or completely, depending on the percentage of the plaintiff's responsibility. *See, e.g.*, *Jannette v. Deprez*, 701 S.W.2d 56, 59 (Tex. App.—Dallas 1985, writ ref'd n.r.e.).

20

Because "avoidance" and "affirmative defense" are closely related terms, courts frequently use the words interchangeably. *See, e.g.*, *MAN Engines*, 434 S.W.3d at 136 (describing disclaimer as both an avoidance and an affirmative defense). Moreover, though a plea in confession and avoidance is historically distinct from an affirmative defense, the modern legal lexicon has muddled the distinction. *Compare Murray v. Gulf, C. & S.F. Ry. Co.*, 11 S.W. 125, 127 (Tex. 1889) ("If defendant relies upon contributory negligence not developed by the plaintiff's case, he must allege it. It is a defense in the nature of avoidance."), *with Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co.*, 20 S.W.3d 692, 696 (Tex. 2000) ("[Defendant] denied responsibility and asserted . . . an affirmative defense against [plaintiff], based on the [plaintiff's] contributory negligence or comparative responsibility.").

Though semantically troubling, lack of precision is inconsequential here. Whether classified as an affirmative defense or an avoidance, the hallmark characteristic of both categories of defenses is that the burden of proof is on the defendant to present sufficient evidence to establish the defense and obtain the requisite jury findings. *See Denton Publ'g. Co. v. Boyd*, 460 S.W.2d 881, 882 (Tex. 1970) (holding that failure to prove and obtain favorable jury findings in support of an avoidance defense constitutes waiver); *Barfield v. Howard M. Smith Co. of Amarillo*, 426 S.W.2d 834, 839 (Tex. 1968) (concluding that estoppel did not bar the petitioner's claim because the defendant failed to prove all the essential elements of the affirmative defense); *Cameron Compress Co. v. Kubecka*, 283 S.W. 285, 287 (Tex. Civ. App.—Austin 1926, writ ref'd) (citing *Boswell v. Pannell*, 180 S.W. 593, 595 (Tex. 1915)); *see also Ingraham v. United States*, 808 F.2d 1075, 1078-79 (5th Cir. 1987) (identifying the features of an affirmative defense).

21

The exemplary damages cap does not bear the characteristics of an affirmative defense or avoidance. Specifically, it does not require proof of any additional fact to establish its applicability; moreover, there is no defense to it. *See* TEX. CIV. PRAC. & REM. CODE § 41.008(b). Though certain types of claims are excluded from the statute's application, the statutory cap applies automatically to claims not expressly excepted. The cap is therefore the rule, not the exception.

A plaintiff can avoid the cap by pleading and proving the defendant intentionally or knowingly engaged in felonious conduct under criminal statutes expressly excluded from the cap under section 41.008(c). *See In re Columbia Med. Ctr. of Las Colinas*, 306 S.W.3d 246, 248 (Tex. 2010); *see also THI of Tex. at Lubbock I, LLC v. Perea*, 329 S.W.3d 548, 588 (Tex. App.—Amarillo 2010, pet. denied); *Hall v. Diamond Shamrock Ref. Co., L.P.*, 82 S.W.3d 5, 22 (Tex. App.—San Antonio 2001), *rev'd on other grounds*, 168 S.W.3d 164 (Tex. 2005). Nevertheless, the prospect of avoiding the cap upon plea and proof of cap-busting conduct, if possible, does not alter the fundamental principle that the statute does not impose a burden of proof on the defendant. Even in cases in which an exception is or may be invoked, the defendant bears no burden of establishing the cap's applicability; it either applies or it does not. We therefore conclude that the statutory cap on exemplary damages in section 41.008(b) is neither an affirmative defense nor an avoidance subject to Rule 94's affirmative pleading requirement.[11]

Because the statutory cap on exemplary damages automatically applies and its scope is

---

[11] Although not presented with such a scenario here, we do not foreclose the possibility that a different outcome might result if a damages cap applies only with proof of additional facts or circumstances. *See, e.g.*, *Shoreline, Inc. v. Hisel*, 115 S.W.3d 21, 25 (Tex. App.—Corpus Christi 2003, pet. denied) (analyzing TEX. LAB. CODE § 21.2585(d), which provides different damages caps depending on how many employees a responsible party employs).

delineated by statute, there is little concern that plaintiffs will be genuinely surprised by its application in any given case. *MAN Engines*, 434 S.W.3d at 136 ("Rule 94's purpose 'is to give the opposing party notice of the defensive issue to be tried.' It is a rule of fairness that requires the defendant to identify affirmative defenses, involving facts distinct from the elements of the plaintiff's claim, so that the plaintiff may reasonably prepare to rebut or explain them.") (quoting *Land Title Co. of Dallas, Inc. v. F.M. Stigler, Inc.*, 609 S.W.2d 754, 756 (Tex. 1980))). Section 41.008, in and of itself, provides sufficient notice of the types of claims that are excluded from the cap, allowing plaintiffs to structure their cases to avoid the cap when desired and possible. *See* TEX. CIV. PRAC. & REM. CODE § 41.008(c) (listing the crimes and intentional torts excluded from the statutory cap on exemplary damages). In the absence of a plea and proof of cap-busting conduct, the exemplary damages cap applies as a matter of law.

Zorrilla timely claimed the protection of the exemplary damages cap in her motion for new trial. *See* TEX. R. APP. P. 33. We therefore reverse the court of appeals' judgment and render judgment capping exemplary damages at $200,000. *See* TEX. CIV. PRAC. & REM. CODE § 41.008(b).

### C. Prejudgment Interest under the Prompt Payment Act

We next address Zorrilla's argument that the prejudgment-interest rate awarded to Aypco is excessive. In post-verdict motions filed in the trial court, Zorrilla argued that prejudgment interest should be set at 6% per annum because there was no proof of an agreement specifying a different interest rate. The trial court, however, awarded prejudgment interest at the rate of 1.5% per month under the Prompt Payment Act, which applies when a real property owner fails to pay a contractor the amount allowed under a contract within 35 days after the owner receives a written payment

23

request from the contractor. *See* TEX. PROP. CODE §§ 28.002(a) (requiring prompt payment for properly performed work, suitably stored materials, and specially fabricated materials), .004 (specifying the rate and accrual of interest on an overdue payment).

On appeal, Zorrilla more precisely articulates that the Prompt Payment Act is inapplicable because there is insufficient evidence she agreed to compensate Aypco for the construction work performed in May 2007. The court of appeals concluded that the essential contract finding was subsumed in the jury's fraud verdict, in which the jury expressly found that Zorrilla failed to pay Aypco $56,654.15 for construction services pursuant to an agreement to pay for that work. 421 S.W.3d at 73. Because the court concluded the evidence was sufficient to support the fraud verdict, and based on Aypco's election of fraud remedies, the court determined that Zorrilla's evidentiary challenges to the jury's breach-of-contract findings were not material to the prejudgment-interest inquiry. *Id.* (citing TEX. R. APP. P. 47.1).

The nature of Zorrilla's complaint here is somewhat muddled. To the extent Zorrilla contends the fraud finding cannot be considered without reference to the breach-of-contract findings, we have already resolved that matter against Zorrilla.[12] To the extent she argues there is no evidence she agreed to compensate Aypco for construction services and expenses in May 2007, we conclude there is more than a scintilla of evidence to support the jury's finding of such an agreement. *See Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014) (setting forth the legal-sufficiency standard of review). We therefore affirm the award of prejudgment interest at the rate of 1.5% per month.

---

[12] Zorrilla's asserted excuse for noncompliance with the agreement—that she never authorized the May 2007 construction services at all or in writing—was subsumed in the phrasing of the contract question submitted to the jury and is duplicative of her claim challenging the existence of an agreement in the first instance.

**D. Statutory and Constitutional Liens**

In her final appellate issue, Zorrilla contests foreclosure of the statutory and constitutional mechanic's and materialman's liens on two grounds. The first continues Zorrilla's theme that consideration of her evidence-sufficiency challenges to the jury's breach-of-contract findings was essential to determine the validity of other remedies, including the liens; according to Zorrilla, neither lien is valid if there is no valid agreement pertaining to the debt. Zorrilla's second argument is that lien foreclosure was improper as to the Plazas del Lago property because it was her homestead and there was no proof of a written agreement.

The trial court ordered foreclosure of a statutory lien on the North 23rd Street property and a constitutional lien on the Plazas del Lago property. Zorrilla contends that both types of liens require proof of a contractor's performance and the existence of a debt. *See AMX Enters., L.L.P. v. Master Realty Corp.*, 283 S.W.3d 506, 522 (Tex App.—Fort Worth 2009, no pet.) (constitutional lien); *MG Bldg. Materials, Ltd. v. Moses Lopez Custom Homes, Inc.*, 179 S.W.3d 51, 59 (Tex. App.—San Antonio 2005, pet. denied) (statutory lien); *see also* TEX. CONST. art XVI, § 37 ("Mechanics, artisans and material men, of every class, shall have a lien upon the buildings and articles made or repaired by them for the value of their labor done thereon, or material furnished therefor; and the Legislature shall provide by law for the speedy and efficient enforcement of said liens."); TEX. PROP. CODE ANN. § 53.021(a)(2) ("A person has a lien if . . . the person labors, specially fabricates the material, or furnishes the labor or materials under or by virtue of a contract with the owner or the owner's agent, trustee, receiver, contractor, or subcontractor.").

The court of appeals upheld foreclosure of the liens based on the jury's fraud verdict because

the court had found sufficient evidence to support the verdict and, as part of the fraud submission, the jury determined that Aypco was entitled to compensation for the work performed in accordance with an agreement with Zorrilla. 421 S.W.3d at 73. We agree with the court of appeals' analysis of this issue. Performance and existence of a contractual debt were encompassed in the jury's fraud findings; the court of appeals found the evidence sufficient to sustain the fraud verdict; and Zorrilla does not challenge the court of appeals' analysis of that issue. We therefore reject Zorrilla's first basis for challenging foreclosure of the liens.

Zorrilla argues in the alternative that foreclosure of the constitutional lien on Plazas del Lago was improper because the property was her homestead and there was no written contract with a three-day rescission period as required by article 16, section 50 of the Texas Constitution. *See* TEX. CONST. art XVI, § 50(a)(5) ("The homestead . . . is hereby protected from forced sale, for the payment of all debts except for: . . . work and material used in constructing new improvements thereon, if contracted for in writing . . . [and other requirements are met]."). Zorrilla did not preserve this argument in the trial court; rather, in her motion for new trial, Zorrilla claimed the North 23rd Street property as her homestead and asserted noncompliance with section 53.254 of the Texas Property Code as a bar to foreclosing the statutory lien on that property.

Even if the issue had been preserved, Zorrilla failed to establish Plazas del Lago as her homestead. *See Burk Royalty Co. v. Riley*, 475 S.W.2d 566, 568 (Tex. 1972) (initial burden to establish a homestead exemption is on the party claiming the exemption). To claim the constitutional protection afforded to homesteads, Zorrilla carried the initial burden of establishing (1) overt acts of homestead usage and (2) the intention to claim the property as a homestead. *See Cheswick v.*

*Freeman*, 287 S.W.2d 171, 173 (Tex. 1956); *Cameron v. Gebhard*, 22 S.W. 1033, 1034 (Tex. 1893); *Thomas v. Graham Mortg. Corp.*, 408 S.W.3d 581, 588 (Tex. App.—Austin 2013, pet. denied). Once a property is established as a homestead, the burden shifts to the party challenging a homestead claim to prove termination of homestead status "by abandonment, alienation, or death." *Wilcox v. Marriott*, 103 S.W.3d 469, 472 (Tex. App.—San Antonio 2003, pet. denied); *see also Marincasiu v. Drilling*, 441 S.W.3d 551, 559 (Tex. App.—El Paso, pet. denied).

Whether a property is a homestead is a question of fact. *Brown v. Bank of Galveston, Nat'l Ass'n*, 963 S.W.2d 511, 515 (Tex. 1998), *abrogated on other grounds by Ford Motor Co. v. Ledesma*, 242 S.W.3d 32 (Tex. 2007). Because Zorrilla failed to request a jury question on this issue, the issue is waived unless she conclusively established Plazas del Lago as her homestead. *Id.* She failed to do so.

The only evidence bearing on the issue is testimony from Zorrilla and Munoz that she was "living" at Plazas del Lago at some point during construction on the North 23rd Street site. Merely taking residence in a home for an unspecified length of time is not sufficient to conclusively establish the property as a homestead. *Hilliard v. Home Builders Supply Co.*, 399 S.W.2d 198, 201 (Tex. Civ. App.—Fort Worth 1966, writ ref'd n.r.e.) ("The mere fact that they may have actually resided in the house over weekends or at other times of longer duration standing alone does not convert it to a homestead. . . . The court may not assume facts to support a claim of homestead against the validity of an existing debt or lien."); *see also Purdin v. Jenkins*, 337 S.W.2d 418, 421 (Tex. Civ. App.—Dallas 1960, no writ); *Roberson v. Home Owners' Loan Corp.*, 147 S.W.2d 949, 952 (Tex. Civ. App.—Dallas 1941, writ dism'd judgm't cor.). Similarly, the word "home" is not necessarily

synonymous with "homestead." *West v. Austin Nat'l Bank*, 427 S.W.2d 906, 912 (Tex. Civ. App.—San Antonio 1968, writ ref'd n.r.e.). There was also some evidence that Zorrilla owned other residential property in addition to the North 23rd Street and Plazas del Lago properties.

Zorrilla did not conclusively establish the concurrence of usage and intent that is required to establish Plazas del Lago as her homestead. Accordingly, she failed to establish a constitutional impediment to foreclosure of the lien on that property.

### III. Conclusion

For the reasons stated, we reverse the court of appeals' judgment as to the exemplary damages award and render judgment capping exemplary damages at $200,000. We otherwise affirm the court's judgment.

_____
Eva M. Guzman
Justice

**OPINION DELIVERED**: June 12, 2015

28